IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KATHY HALLAM, JULIE OGDEN AND NANCY RAGAN, ) ) ) | |
| Plaintiffs, ) ) | **CIVIL ACTION** |
| v. ) ) | No.  03-1177-MLB |
| MERCY HEALTH CENTER OF MANHATTAN, INC., ) ) ) ) | |
| Defendant. ) ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion for summary judgment.  (Doc. 73).  The motion has been fully briefed and is ripe for decision.  (Docs. 73, 79, 81).  For the reasons herein, defendant's motion is granted in part and denied in part.

**I.   FACTS**

Edward Odgen (Edward) was admitted to defendant's emergency room on August 26, 2001, for treatment of a heart attack.  Treatment of Edward was not successful and he died on August 26, 2001.  Amy Chaplin, defendant's social worker, spoke to individuals present in the hospital at the time of Edward's death.  Chaplin was attempting to determine the next of kin in order to discuss organ donation. Edward was not married at the time of his death, but the hospital records did demonstrate that Pat Kunz was Edward's girlfriend. Chaplin began discussing organ donation with Kunz.  Defendant's employees did not discuss organ donation with Bill Odgen, Edward's step-father, William Earl Odgen, Edward's half-brother, or Edward's ex-wife.  All of these individuals were present at the hospital.

Chaplin did contact Julie Odgen, Edward's daughter, by phone, but did not discuss organ donation with her. The phone conversation was not tape recorded. (Doc. 73 at 3-5; Doc. 79 at 16-17).

Sandra Wernke, defendant's House Supervisor, called the Midwest Organ Transplant Network (Network) to notify them of Edward's death. The Network determined that Edward was a viable eye, long bone and tissue donor. During discussions with Chaplin, Kunz stated that she did not believe that Edward was a candidate for donation because of his health. The remainder of what occurred during their discussions is in dispute. Chaplin concluded that Kunz was Edward's common-law wife. Chaplin completed a form entitled "MIDWEST TRANSPLANT NETWORK Donation Evaluation/Authorization for Anatomical Gifts." (Doc. 73, exh. F). The form stated "I, Patricia Kunz as closest, available, legal next-of-kin of Edward Odgen do hereby make this anatomical gift, I am the legal next-of-kin and there are no other persons with a prior right to make the gift. I am unaware of any contrary desire of the decedent. My relationship to the Decedent is" common law wife. Id. This portion of the form was filled out by Chaplin. Kunz then filled out a portion of the form on the bottom which listed her name and address and phone numbers. Her actual address was scratched out and then Edward's address was written in.

Kuntz does not recall filling out this form or being informed of its contents. Kuntz only remembers having signed a form for Edward's belongings. After the form was signed, Chaplin notified her supervisor and sent the form to the Network. Edward's long bones and eyes were harvested for donation. Plaintiffs, Edward's daughters, did not discover that Edward's eyes and bones had been harvested until

-2-

after they arrived in Kansas.  (Doc. 73 at 5, 7; Doc. 79 at 9).

Plaintiffs filed a complaint alleging intentional infliction of emotional distress, conversion, fraud, outrage and intentional interference with a dead body.  Defendant seeks summary judgment on the basis of immunity under the Uniform Anatomical Gift Act (UAGA). In the alternative, defendant's assert that plaintiffs' claims fail as a matter of law.

## II.  SUMMARY JUDGMENT STANDARD

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.  Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

**III. ANALYSIS**

   **A.   Immunity under the UAGA**

The UAGA was created, in part, in order to create unified laws regarding organ donation.

> Wherever adopted . . . [the UAGA] will encourage the making of anatomical gifts, thus facilitating therapy involving such procedures. When generally adopted, . . . uncertainty as to the applicable law will be eliminated and all parties will be protected. At the same time the Act will serve the needs of the several conflicting interests in a manner consistent with prevailing customs and desires in this country respecting dignified disposition of dead bodies.

Perry v. Saint Francis Hosp. and Medical Center, Inc., 886 F. Supp. 1551, 1556 (D. Kan. 1995)(Perry II)(citing 8A U.L.A. 15). The UAGA was adopted in Kansas in 1968. Defendant asserts that the good faith immunity provision of the UAGA is applicable in this case.

> A person who acts in good faith in accord with the terms of this act or the anatomical gift laws of another state or a foreign country is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act.

K.S.A. 65-3215(c). "Plainly, this section extends protection to doctors and hospitals in all instances but where the challenged actions violate or exceed the terms of UAGA and are taken without a good faith effort to comply with UAGA." Perry II, 886 F. Supp. at 1556-1557. Good faith is "an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage." Id.

Defendant contends that the question of its good faith is a question of law, not one of fact, and must be resolved on summary judgment. The authority defendant has cited, however, can be clearly distinguished from this case. Those cases determined that no material

facts existed and that the uncontroverted facts established that the defendants acted in good faith.  See Nicoletta v. Rochester Eye and Human Parts Bank, Inc., 519 N.Y.S.2d 928, 932 (N.Y. Sup. 1987)("based on the uncontroverted evidence produced at the Examination Before Trial, defendant-Hospital had neither actual nor constructive knowledge that Judy Shufelt was not who she said she was, to wit, Peter Nicoletta's wife"); Hinze v. Baptist Memorial Hosp., 1990 WL 121138, *5 (Tenn. Ct. App. 1990)("Nowhere in the pleadings is it alleged that MSEB had actual notice that the gift was opposed by a member of any of the classes of individuals set forth in the form."); Brown v. Del. Valley Transplant Program, 615 A.2d 1379, 1385 (Pa. Super. 1992)("appellees complied with the requirements of the Act, and in fact, went beyond that which was required of them by seeking a court order granting its consent."); Kelly-Nevils v. Detroit Receiving Hosp., 526 N.W.2d 15, 19 (Mich. Ct. App. 1994)("We further conclude that the circuit court properly determined that defendant had acted in good faith in relying on Shawn Kelly's [undisputed] representation that he was Christopher Kelly's brother and only living relative.")

In this case, Kunz testified that she never represented to Chaplin that she was Edward's common law wife, but rather consistently stated that she was only the girlfriend. (Doc. 79 at 17). Moreover, Chaplin testified that she overheard a relative state that Kunz was not Edward's common-law wife. (Doc. 73, exh. B at 60). Nancy Knopp, defendant's social work supervisor, testified that a person representing herself as Edward's girlfriend would not be able to make decisions regarding organ transplant. (Doc. 73, exh. D at 37).

Plaintiffs' evidence, if true, would support a finding that

-5-

defendant violated the UAGA by having obtained consent from a person who was not qualified to consent. K.S.A. 65-3210(b). This would be inconsistent with the definition of good faith. While defendant might be entitled to a finding of good faith as a matter of law if the evidence was undisputed that Kunz consistently represented that she was the common-law wife, that is not the case. Defendant's motion for summary judgment on the basis of immunity under the UAGA is denied.

**B.    Conversion**

"Conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." Bomhoff v. Nelnet Loan Servs., Inc., 279 Kan. 415, 421, 109 P.3d 1241, 1246 (2005). Plaintiffs assert that the property right in this case is the right of plaintiffs to receive the body in its condition on death and prepare the body for burial. Plaintiffs cite three cases for the proposition that a valid claim for conversion lies in the taking of this "quasi-property right." The cases, however, do not support plaintiffs assertion. In all three cases, the plaintiffs were alleging a claim for the conversion of the body parts, not the right to receive the body in its condition on death. Bauer v. North Fulton Medical Center, Inc., 527 S.E.2d 240, 244 (Ga. App. Ct. 1999)(held that spouse had not asserted a valid claim for conversion since there was no pecuniary interest in body parts); Perry v. Saint Francis Hosp. and Medical Center, Inc., 865 F. Supp. 724, 728 (D. Kan. 1994)(Perry I)(conversion claim alleged that the American Red Cross converted the bones and tissues removed from the body); Wint v. Ala. Eye & Tissue Bank, 675 So.2d 383, 385 (Ala. 1996)(dismissed claim for conversion

-6-

due to lack of evidence that defendant removed the decedent's eyes).

Plaintiffs have failed to identify any authority that recognizes a claim for conversion of this "quasi-property right." Plaintiffs' claim is not against defendant for exercising control over the body parts; the only claim that could arguably withstand summary judgment. The evidence is undisputed that defendant did not perform the harvesting of the eyes and bones, but it was in fact performed by the Network. (Doc. 79, exh. A at 7). Accordingly, plaintiffs' claim for conversion fails as a matter of law. Defendant's motion for summary judgment is granted.

**B.   Intentional Infliction of Emotional Distress/Outrage**

Plaintiffs have stated a claim for both intentional infliction of emotional distress and outrage. Under Kansas law, these claims are identical. Hallam v. Mercy Health Center of Manhattan, Inc., 278 Kan. 339, 340, 97 P.3d 492, 494 (2004). In evaluating on summary judgment a claim for emotional distress, the court must determine: "(1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." Roberts v. Saylor, 230 Kan. 289, 292-293, 637 P.2d 1175 (1981). Conduct is sufficient to satisfy this test when it is so outrageous and extreme in degree "as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." Fusaro v. First Family Mortgage Corp., 257 Kan. 794, 805, 897 P.2d 123 (1995). Kansas courts have repeatedly stated that liability may be

found when "the recitation of the facts to an average citizen would arouse resentment against the actor and lead that citizen to spontaneously exclaim, 'Outrageous!'" Id.

Plaintiffs have alleged that defendant's employees identified Kunz as Edward's common-law wife even though Kunz has testified that she repeatedly stated she was only Edward's girlfriend. Kunz also testified that she does not remember being informed or agreeing to the donation. Kunz testified that the decision to donate would have been for the daughters to decide. Moreover, Chaplin was told by a family member that Kunz was not Edward's common-law wife. The court in Perry II, discussed how situations after the death of a loved one are vulnerable times. A person who is employed by the hospital to inform relatives of the possibility of donations assumes a position of authority and trust. Perry II, 886 F. Supp. at 1561. Instead of assisting the family, Chaplin allegedly manipulated a form in order to get approval of a donation that she would not have received had Kunz been correctly identified as the girlfriend.

Senior Judge Crow determined that the defendant's conduct in Perry II was outrageous after the plaintiffs produced evidence that the nurse failed to limit the donation to the extent requested by the family. The plaintiffs had agreed to only the removal of the cornea and not the entire eye. In addition, the plaintiffs only wanted the bone marrow removed and not the entire bones. Senior Judge Crow found that plaintiffs' evidence demonstrated that the nurse's conduct could be construed as outrageous. Id.

Once again, the court cannot find as a matter of law that plaintiffs' claims, if proven would not cause a reasonable person to

-8-

exclaim "Outrageous." At this stage, the court cannot weigh the disputed evidence or judge the credibility of witnesses whose testimony is in dispute.

In addressing the second requirement for the tort of outrage, whether the emotional distress is extreme, Senior Judge Crow stated the following:

> The historical roots to an independent action for the tort of outrage are found in cases involving funerals, death messages, and the mishandling of corpses. See Brown v. Matthews Mortuary, Inc., 118 Idaho 830, 801 P.2d 37, 40-41 (1990); Rubin v. Matthews Intern. Corp., 503 A.2d 694, 699 (Me. 1986). In keeping with that, courts traditionally work from the premise that it is foreseeable the immediate family will likely experience serious emotional distress from the mishandling of a loved one's dead body. See Christensen v. Superior Court, 54 Cal.3d 868, 820 P.2d 181, 2 Cal. Rptr.2d 79, 94 (1991) (mishandling of corpse is "likely to cause serious emotional distress ... regardless of whether they observe the actual ... conduct or injury to the remains of their decedent"); Alderman v. Ford, 146 Kan. 698, 702, 72 P.2d 981 (1937) ("That mental suffering and injury to the feelings would be ordinarily the natural and proximate result of knowledge that the remains of a deceased husband had been mutilated, is too plain to admit of argument." (quoting Larson v. Chase, 47 Minn. 307, 312, 50 N.W. 238 (1891)); Rubin, 503 A.2d at 699 n. 6 ("The defendant's conduct in cases where such damages have historically been awarded for intentional infliction of emotional distress has been more closely associated with the burial services or the dead body." (citations omitted)). In short, the courts have appreciated the emotional stress caused from grieving a loved one's death and have viewed the grieving family members as emotionally susceptible with regards to their feelings towards the decedent's remains.

Perry II, 886 F. Supp. at 1561. The court is additionally concerned of the impact since plaintiffs have asserted that Edward's Native American beliefs stressed the importance of having his entire body intact when he was buried. Plaintiffs claim to have endured nightmares and extreme feelings of guilt necessitating therapy. After considering the Kansas Supreme Court's opinion in Alderman, the court

-9-

finds that the removal of body parts without proper consent arguably could cause extreme emotional distress to plaintiffs.

Defendant's motion to dismiss plaintiffs' claims for intentional infliction of emotional distress and outrage is denied.[1]

**C.   Fraud**

Plaintiffs assert two separate allegations of fraud. First, they claim that defendant's characterization of Kunz as Edward's common-law wife was fraudulent. Second, they claim that defendant failed to disclose to plaintiffs its decision to declare Kunz the common-law wife and allow her to consent for the donation.

> Actionable fraud includes an untrue statement of material fact, known to be untrue by the person making it, made with the intent to deceive or recklessly made with disregard for its truthfulness, where another party justifiably relies upon the statement and acts to his injury. The injured party must have been deceived by, and have relied upon, the defendant's misrepresentations in order to recover damages for fraud. The injured party's reliance on a fraudulent misrepresentation must be reasonable, justifiable and detrimental.

Wilson v. Meeks, 98 F.3d 1247, 1254 (10th Cir. 1996) (quoting Slaymaker v. Westgate State Bank, 241 Kan. 525, 531, 739 P.2d 444, 450 (1987)). Under Kansas law, fraud also includes the failure to disclose information that one is under a legal or equitable duty to disclose. Mid Kansas Federal Sav. and Loan Ass'n of Wichita v. Orpheum Theater Co., Ltd., 810 F. Supp. 1184, 1194 (D. Kan. 1992).

While plaintiffs assert that defendant made a false statement in declaring that Kunz was Edward's common-law wife, plaintiffs fail to allege how they relied on that statement. Plaintiffs have asserted

---

[1] Since these claims are identical, plaintiffs will only be able to proceed on one claim at trial.

only that they relied on defendant's omissions. (Doc. 79 at 35-37). Accordingly, as a matter of law, plaintiffs' claim for false representations cannot survive summary judgment. Moreover, plaintiffs' claim for fraudulent omissions was not presented in the pretrial order and, therefore, plaintiffs are foreclosed from proceeding under this theory.[2] (Doc. 74 at 15).

Defendant's motion for summary judgment on plaintiffs' fraud claim is granted.

### D. Negligence

Plaintiffs have asserted a claim against defendant for failure to train its employees on how to obtain the proper consent for organ donation. Defendant seeks summary judgment on this claim on the basis that plaintiffs have not suffered a physical injury. Under Kansas law, in a negligence action, a plaintiff cannot recover damages for emotional distress unless physical injury has occurred. Humes v. Clinton, 246 Kan. 590, 598, 792 P.2d 1032, 1038 (1990)(the plaintiff's claim against her doctor for failure to warn of the side effects of a surgery could not survive summary judgment since plaintiff did not suffer a physical injury). Plaintiffs acknowledge that no physical injury occurred and are seeking damages solely for emotional distress. (Doc. 79 at 41).

Defendant's motion for summary judgment on plaintiffs' negligence claim is accordingly granted.

### E. Intentional Interference with a Dead Body

---

[2] A pretrial order has been entered in this case that expressly supercedes all pleadings and controls the future course of the litigation. (Doc. 74 at 1;) see also Fed. R. Civ. P. 16(e).

-11-

Kansas courts have recognized a cause of action when an individual interferes with a dead body. In order to succeed on their claim, plaintiffs must prove that defendant's actions were intentional or malicious and the interference must be the cause of the mental anguish and/or physical illness of plaintiffs. Burgess v. Perdue, 239 Kan. 473, 480, 721 P.2d 239, 245 (1986). As stated previously, the record shows conflicting testimony about what occurred prior to the harvesting of Edward's eyes and bones. Viewing all facts in favor of plaintiffs, a reasonable jury could conclude that defendant's actions were intentional. Regardless of the exact motive, plaintiffs' evidence, if proved, could support a finding that defendant characterized Kunz' relationship with Edward as that of a common-law marriage in order to gain permission for the donation. Those actions, if believed, were intentional, not negligent.

Since disputes of genuine material fact exist on the issue of whether defendant's actions were intentional, defendant's motion for summary judgment is denied.

**F.  Punitive Damages**

After reviewing the record, the court finds that there are genuine issues of material fact as to punitive damages on plaintiffs' remaining claims. Defendant's motion for summary judgment is denied.

**IV.  CONCLUSION**

Defendant's motion for summary judgment on the issue of immunity is denied. Defendant's motion for summary judgment on plaintiffs' claims for conversion, fraud and negligence is granted. Defendant's motion for summary judgment on plaintiffs' claims for outrage, intentional interference with a dead body and punitive damages is

-12-

denied.

A motion for reconsideration is neither invited nor encouraged. Any such motion shall not exceed three double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (D. Kan. 1992).  The response to any motion for reconsideration shall not exceed three double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this  22nd   day of November 2005, at Wichita, Kansas.

s/ Monti Belot<br>
Monti L. Belot<br>
UNITED STATES DISTRICT JUDGE

-13-